**FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
MNI MANAGEMENT, INC.,          :
                               : CIVIL ACTION NO. 07-6111 (MLC)
        Plaintiff,             :
                               :       MEMORANDUM OPINION
        v.                     :       FILED: MARCH 10, 2008
                               :
WINE KING, LLC, et al.,        :
                               :
        Defendants.            :
_____:
```

**COOPER, District Judge**

**APPEARANCES**

Neil B. Friedman
Baker & Rannells, PA, Raritan, New Jersey
Attorney for Plaintiff

Cindy D. Salvo
The Salvo Law Firm, Roseland, New Jersey
Attorney for Defendants

**TABLE OF CONTENTS**

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . **2**
**BACKGROUND AND FACTUAL FINDINGS**. . . . . . . . . . . . . . . **4**
**CONCLUSIONS OF LAW** . . . . . . . . . . . . . . . . . . . . . **9**
**I.   LEGAL STANDARDS** . . . . . . . . . . . . . . . . . . . **11**
    **A.   Preliminary Injunctions** . . . . . . . . . . . . . **11**
        **1.   Reasonable Likelihood of Success on the Merits** **12**
        **2.   Irreparable Injury** . . . . . . . . . . . . . **13**
        **3.   Harm to Nonmoving Party** . . . . . . . . . . . **13**
        **4.   The Public Interest** . . . . . . . . . . . . . **14**
**B.   Trademark Infringement**. . . . . . . . . . . . . . . . **14**
        **1.   Validity** . . . . . . . . . . . . . . . . . . **16**
        **2.   Ownership** . . . . . . . . . . . . . . . . . . **18**
            **a.   Market Penetration** . . . . . . . . . . **20**
            **b.   Reputation** . . . . . . . . . . . . . . **21**
            **c.   Zone of Natural Expansion**. . . . . . . **21**
            **d.   Good Faith** . . . . . . . . . . . . . . **23**
        **3.   Likelihood of Confusion** . . . . . . . . . . . **24**
**II.  LEGAL STANDARDS APPLIED HERE**. . . . . . . . . . . . . . **27**
    **A.   Reasonable Likelihood of Success on the Merits** . . . **27**

      1.    The First Mark is Valid and Legally Protectable 27

      2.    Plaintiff Has Not Established a Likelihood of Direct Confusion in Defendants' Geographic Market . . . . . . . . . . . . . . . . . . . . . 29

           a.    Plaintiff Has Not Penetrated Defendants' Geographic Market . . . . . . . . . . . 31

               i.  Volume of Sales . . . . . . . . . 31

               ii.  Growth Trends . . . . . . . . . . 31

               iii. Actual Customers and Potential Customers . . . . . . . . . . . . . 32

               iv.  Amount of Advertising in Area . . . . 33

           b.    Plaintiff's Reputation Does Not Extend Into Defendants' Geographic Market . . . . 33

           c.    Plaintiff's "Zone of Natural Expansion" Does Not Extend Into Defendants' Geographic Market . . . . . . . . . . 34

           d.    Plaintiff Has Not Established that Defendant Did Not Act in Good Faith . . . 36

           e.    Summary of Findings . . . . . . . . . 38

      3.    Plaintiff Has Not Established a Likelihood of Reverse Confusion in Plaintiff's Geographic Market . . . . . . . . . . . . . . . . . . . 39

           a.    Degree of Similarity . . . . . . . . . 39

           b.    Strength . . . . . . . . . . . . . . 40

           c.    Expected Care and Attention of Customers . 43

           d.    Channels of Trade, Advertisements, and Targets of Sales Efforts . . . . . . . . 44

           e.    Length of Time & Actual Confusion . . . . 45

           f.    Defendants' Intent . . . . . . . . . . 46

           g.    Relationship of Services in Consumers' Minds . . . . . . . . . . . . . . . . 47

           h.    Other Factors. . . . . . . . . . . . . 48

           i.    Balancing the Factors. . . . . . . . . 48

   B.    Irreparable Injury . . . . . . . . . . . . . . 49

   C.    Harm to Defendants . . . . . . . . . . . . . . 50

   D.    The Public Interest . . . . . . . . . . . . . 52

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 53

### INTRODUCTION

Plaintiff, MNI Management, Inc., moves to preliminarily enjoin defendants, Wine King, LLC and Venkata G.R. Indukuri (collectively, "defendants"), from infringing on its mark, "WINE

KING", in violation of the Lanham Act, 15 U.S.C. § ("Section") 1051, et seq., and New Jersey common law.  (Dkt. entry no. 1.) Plaintiff contends that defendants' use of the mark, "WINE KING", infringes upon its rights because (1) plaintiff owns the mark, "WINE KING", (2) it is valid and protectable, and (3) defendants' use of the mark "WINE KING" is likely to create confusion in the marketplace.  (Dkt. entry no. 1, Pl. Br., at 7-13.)  Thus, plaintiff contends that defendants should be preliminarily enjoined, pending a trial on the merits, from continuing to use the mark because plaintiff will suffer irreparable harm if the injunction is not granted.  (Id. at 13-15.)  Defendants oppose the motion.  (Dkt. entry no. 8.)  The Court has considered the papers submitted by the parties and heard oral argument on February 13, 2008.  The Court issues its findings of fact and conclusions of law as required by Federal Rule of Civil Procedure ("Rule") 52.  For the reasons stated herein, the Court will deny the motion.[1]

---

[1] The documents of record pertinent to this motion, cited by docket entry number where available ("dkt.") are:  plaintiff's moving brief (dkt. entry no. 1); defendants' opposition brief (dkt. entry no. 8); plaintiff's reply brief (dkt. entry no. 9); defendants' 1-16-08 letter (dkt. entry no. 10); plaintiff's 2-12-08 letter (dkt. entry no. 14); plaintiff's 2-29-08 letter and attached document (dkt. entry no. 16); defendants' 3-3-08 letter (dkt. entry no. 17); the declaration of Michael Vekshteyn and attached exhibits (dkt. entry no. 1); the declaration of Stephen L. Baker and attached exhibit (dkt. entry no. 1); the declaration of Venkata Indukuri and attached exhibits (dkt. entry no. 8); the declaration of Cindy D. Salvo and attached exhibit (dkt. entry

## BACKGROUND AND FACTUAL FINDINGS

### I.   Plaintiff

Plaintiff is a New Jersey corporation with its principal place of business in Franklin Lakes, New Jersey.  (Dkt. entry no. 1, Compl., at ¶ 1.)  Plaintiff is "engaged in offering retail store services for alcoholic and non-alcoholic beverages and related glassware and bar accessories".  (Id. at ¶ 6.)

Plaintiff's predecessor-in-interest, B.L.W. World, Inc. ("B.L.W."), began using the trade name "WINE KING" in 1998 to identify its retail store for alcoholic and non-alcoholic beverages and related glassware and bar accessories.  (Dkt. entry no. 1, Decl. of Michael Vekshteyn, at ¶ 2.)  In 2001, B.L.W. began using "WINE KING" (the "First Mark") as a service mark. (Id. at ¶ 3.)

Second and third locations of plaintiff's retail store were also opened in 2001.  (Id.)  Thus, plaintiff has licensed the First Mark to three retail store locations in New Jersey.  (Id. at ¶ 5.)  A store is located on Bergen Boulevard in Fort Lee, New Jersey, in Bergen County.  (Id.)  A second store is located on

_____

no. 8); the declaration of Neil B. Friedman and attached exhibits (dkt. entry no. 9); the declaration of Peter J. Sheehan and attached exhibit (dkt. entry no. 9); the surreply declaration of Venkata Indukuri (dkt. entry no. 10); the declaration of Jason Oppenberg (dkt. entry no. 10); and the declaration of James A. Mathews.  (Dkt. entry no. 14.)  No party has ordered a transcript of the 2-13-08 oral argument, and thus, the Court will cite to that oral argument as "2-13-08 Oral Arg."

4

Route 17 in Hackensack, New Jersey, also in Bergen County.  (Id.)
A third store is located on Route 10 in Randolph, New Jersey, in
Morris County.  (Id.)  The volume of sales at these retail stores
has been in excess of $10 million each year.  (Decl. of Michael
Vekshteyn, at ¶ 6.)

The First Mark was affixed to store signage in 2001, both on
the inside and outside of the stores.  (Id. at ¶¶ 3, 5.)  At that
time, B.L.W. also began engaging in advertising for its retail
store locations.  (Id. at ¶ 4.)  This advertising consisted of
print media in the form of newspapers advertisements and flier
inserts, which were circulated and distributed "throughout the
state of New Jersey".  (Id.)  Plaintiff also operates an Internet
webpage; however, it is not yet functional.  (2-13-08 Oral Arg.)
See http://thewineking.com (last visited March 10, 2008).

Plaintiff's stores also offer customers a "bonus incentive
program".  (Decl. of Michael Vekshteyn, at ¶ 4.)  Over 13,000
customers participate in this program, which offers discounted
prices on products to members of the program.  (Id.; dkt. entry
no. 9, Decl. of Peter J. Sheehan, Ex., Customer Database Lists
for Hackensack, N.J. and Randolph, N.J. Stores ("Customer
Database").)[2]  The Customer Database indicates that these

---

[2] The declaration of Michael Vekshteyn states that the
number of customers is approximately 10,000.  (Decl. of Michael
Vekshteyn, at ¶ 4.)  However, this Court's count reveals the
number of customers registered in the bonus incentive program to
be over 13,000.  (See Customer Database.)  Further, since the

customers reside in various states, including New Jersey, New
York, Connecticut, and Pennsylvania.  (Id.)

Plaintiff applied for a federal servicemark on November 19,
2007, for "retail store services featuring a wide variety of
consumer goods of others; retail store services in the field of
alcoholic and non-alcoholic beverages, ice, smokers' articles,
snack foods, books, cork screws, wine tote bags, and wine
accessories, namely, stemware, wine bottle stoppers, decanters,
and featuring a bonus incentive program for customers."  (Decl.
of Michael Vekshteyn, at ¶ 7.)  See Record of Plaintiff's
Trademark Application, at FEDTM 77333384.  The status of this
application is "pending".  See Record of Plaintiff's Trademark
Application, at FEDTM 77333384.

## II.  Defendants

Defendant Wine King, LLC is a New Jersey limited liability
corporation with its principal place of business in Manasquan,
New Jersey.  (Compl., at ¶ 2.)  Defendant Venkata G.R. Indukuri
("Indukuri") is the President of defendant Wine King, LLC.  (Id.
at ¶ 3.)  In March 2006, Indukuri asked his certified public
accountant, David J. Kosek ("Kosek"), to "look into the formation
of a limited liability company which [Indukuri] had hoped to call

_____

Customer Database only includes (1) the customer listings for two
of plaintiff's stores, and (2) those customers actually signed up
for the bonus incentive program, the number of customers is
presumably greater, although the exact number is unknown.

'Wine King, LLC.'" (Dkt. entry no. 8, Decl. of Venkata Indukuri, at ¶ 2.)  Indukuri informed Kosek that Wine King, LLC would own and operate a retail wine and liquor store.  (Id.)  Kosek informed Indukuri that he would run a check on the name's "availability."  (Id.)

Kosek informed Indukuri soon thereafter that he had performed an "online search" the name "Wine King" was "available."  (Id.)  Indukuri's understanding was that "there was no corporations nor limited liability companies called 'Wine King,'" and "that Mr. Kosek had determined that 'Wine King' was not a registered trademark."  (Id.)  Kosek, however, had only completed a corporate name search, and not done a trademark search.  (Id.; dkt. entry no. 8, Def. Br, at 5.)  Thereafter, Indukuri instructed Kosek to form Wine King, LLC.  (Decl. of Venkata Indukuri, at ¶ 3.)

Defendants entered into a lease for a retail store located on Route 34 in Manasquan, New Jersey, in Monmouth County, in June 2007.  (Id.)  Defendants assert that they were not aware of the existence of plaintiff's retail stores at that time.  (Def. Br., at 6.)  In October 2007, defendants filed an application to register their mark (the "Second Mark") with the state of New Jersey.  (Id.)  This application was rejected because defendants failed to include in the application the required three specimens of the Second Mark, as well as a verbal description of the mark's

appearance.  (Decl. of Venkata Indukuri, Ex. A, Letter from State
of New Jersey.)  Defendants subsequently reapplied, and were
issued the Second Mark by the State of New Jersey on November 26,
2007.  (Id. at ¶ 7.)  See Record of Defendants' Trademark
Registration, at NJTM 22933.

Defendants opened their retail store on November 16, 2007.
(Decl. of Venkata Indukuri at ¶ 8.)  Defendants promoted this
opening on a Monmouth County radio station.  (Id.)  Defendants
also ordered signage for their retail store, and had a highway
billboard created to advertise the retail store.  (Id. at ¶ 9.)
The cost to create this signage was approximately $14,000.  (Id.)
Defendants continue to advertise their store (1) on the radio and
television in Monmouth County, (2) in newspapers, including in
the Asbury Park Press and The Coast Star, and (3) on the
Internet.  (2-13-08 Oral Arg.; dkt. entry no. 9, Decl. of Neil B.
Friedman, at ¶¶ 2, 3.)  See http://wine-king.com (last visited
March 10, 2008).

## III. Events Preceding Commencement of this Action

It is unclear when exactly plaintiff learned of defendants'
use of the Second Mark.  The declaration of Michael Vekshteyn
("Vekshteyn"), the president of MNI Management, Inc., dated
December 26, 2007, states that Vekshteyn "recently" noticed that
MNI had received a statement from a supplier that was directed to
Wine King.  (Decl. of Michael Vekshteyn, at ¶ 8.)  Plaintiff's

8

reply brief further states that "within a week of [defendants'] grand opening [on November 16, 2007] actual confusion occurred". (Dkt. entry no. 9, Pl. Reply Br., at 2.)  Thus, it appears that plaintiff learned of defendants' use of the Second Mark around November 16, 2007.

Plaintiff then sent defendants a letter demanding, <u>inter alia</u>, that defendants cease using the Second Mark as a trademark, service mark, trade name, corporate name, or LLC designation on November 21, 2007.  (Dkt. entry no. 1, Decl. of Stephen L. Baker, Ex. A, Cease and Desist Letter.)  Defendants refused to adhere to plaintiff's demands.  (Decl. of Michael Vekshteyn, at ¶ 15.) Thereafter, plaintiff commenced this action against defendants on December 26, 2007, alleging, <u>inter alia</u>, violations of the Lanham Act and New Jersey common law.  (<u>See</u> Compl.)  The filing of the complaint was accompanied by plaintiff's request for a preliminary injunction, which is the subject of this Memorandum Opinion.  (<u>See</u> dkt. entry nos. 1, 4, 8-10, 14.)

### CONCLUSIONS OF LAW

Plaintiff asserts that defendants' use of the Second Mark constitutes infringement of the First Mark, as (1) the First Mark is valid and protectable, (2) plaintiff owns the First Mark and has territorial rights to enforce the First Mark in its own geographic market and defendants' geographic market, and (3) defendants' use of the Second Mark is likely to cause (a) direct

confusion in defendants' geographic market, and (b) reverse confusion in plaintiff's geographic market.  (Pl. Br., at 8-13; Pl. Reply Br., at 4-7, 8-15.)  Plaintiff also argues that defendants did not act in good faith when they adopted and began using the Second Mark, and thus, defendants are not entitled to trademark protection of the Second Mark in defendants' market. (Id. at 7-8.)

Plaintiff further asserts that defendants' continued infringement of the First Mark will injure plaintiff's reputation and the good will associated with the First Mark.  (Pl. Br., at 13-15.)  Also, plaintiff argues that the harm to plaintiff's reputation and good will outweighs any injury to defendants, and the public interest in avoiding confusion of consumers is best served by granting an injunction.  (Id. at 15-17.)

Defendants argue that the use of the Second Mark is unlikely to cause confusion, and thus does not constitute infringement of the First Mark, because the parties are not competing in the same geographic market.  (Def. Br., at 9-11, 14-16.)  Further, defendants assert that even if plaintiff did have plans to expand into defendants' geographic market, it could not under the "Tea Rose-Rectanus" doctrine.  (Id. at 12-14.)  Defendants also contend that their use of the Second Mark in their market is protected because they adopted the Second Mark in good faith. (Id. at 12 n.3.)

Defendants also contend that their use of the Second Mark in their own market cannot lead to irreparable harm to plaintiff. (Id. at 17.)  Moreover, defendants assert that the harm to defendants if the injunction were to be granted, consisting of financial damages and time needed to change the Second Mark, outweighs any harm to plaintiff if the injunction were to be denied.  (Id. at 18.)  Defendants further contend that since plaintiff has not shown that the public is likely to be confused in either geographic market, granting a preliminary injunction does not support the public interest.  (Id. at 18-19.)

The Court finds that plaintiff has not satisfied the elements of a preliminary injunction such that its requested relief is warranted.  The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation.  See Fed.R.Civ.P. 65(a). The parties have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits.

## I.   Legal Standards

### A.   Preliminary Injunctions

Injunctive relief is an extraordinary remedy, which should be granted only in limited circumstances.  Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).  To obtain such interim relief, a movant must demonstrate both a likelihood of success on the merits and the probability of

11

irreparable harm absent the injunction.  <u>Id.</u>  Thus, in determining whether to issue a preliminary injunction, the Court must consider whether (1) the movant has shown a reasonable probability of success on the merits, (2) the movant will be irreparably injured by denial of the relief, (3) granting the preliminary relief will result in even greater harm to the nonmoving party, and (4) granting the preliminary relief is in the public interest.  <u>ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.</u>, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996); see <u>AT&T Co. v. Winback & Conserve Program, Inc.</u>, 42 F.3d 1421, 1427 (3d Cir. 1994).  The Court should issue an injunction only if the movant "produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  <u>Id.</u> (citation omitted).

### 1.   Reasonable Probability of Success on the Merits

The party seeking a preliminary injunction must demonstrate a "reasonable probability of eventual success in the litigation".  <u>Kershner v. Mazurkiewicz</u>, 670 F.2d 440, 443 (3d Cir. 1982).  In evaluating whether a movant has satisfied this first part of the preliminary injunction standard, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a prima facie case showing a reasonable probability that

12

it will prevail on the merits." <u>Oburn v. Shapp</u>, 521 F.2d 142, 148 (3d Cir. 1975).

### 2.   Irreparable Injury

Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will. <u>Kos Pharm., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 726 (3d Cir. 2004). However, inexcusable delay in seeking a preliminary injunction may defeat a movant's assertion of irreparable harm. <u>Id.</u> at 726-27.

### 3.   Harm to Nonmoving Party

The Court also must analyze whether the nonmoving party will suffer irreparable harm if the preliminary injunction is granted. <u>Id.</u> at 727. If the Court finds that such temporary relief may irreparably harm the nonmoving party, then it must "balance the hardships" to ensure that the injunction does not harm the nonmoving party more than denial of the injunction would harm the movant. <u>Id.</u> (quotation and citation omitted) (noting in trademark infringement action that court should balance hardships to ensure that issuance of injunction would not harm infringer more than denial would harm original mark owner). The injury a nonmoving party might suffer if an injunction is granted should be discounted if there are any facts indicating that the injury was self-inflicted. <u>Id.</u> at 728. Further, "[i]rreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it." <u>Id.</u> at 727 (quotation and citation

13

omitted).  Thus, the Court should not consider financial damages when deciding whether to grant an injunction.  Id. at 728.

### 4.   The Public Interest

The public interest will almost always favor the movant if the movant demonstrates both a likelihood of success on the merits and irreparable injury.  AT&T Co., 42 F.3d at 1427 n.8.

### B.   Trademark Infringement[3]

The Lanham Act prohibits the commercial use of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive".  15 U.S.C. § 1114(1)(a) (discussing trademark infringement).  Further, Section 43(a) of the Act provides:

> Any person who, on or in connection with any goods or
> services, . . . uses in commerce any word, term,

---

[3] This case involves infringement of a service mark.  (2-13-08 Oral Arg.)  The Lanham Act defines a service mark as a mark used "to identify and distinguish the services of one person . . . from the services of others and to indicate the source of the services".  15 U.S.C. § 1127.  By comparison, a trademark is a mark used "to identify and distinguish . . . goods . . . from those manufactured or sold by others and to indicate the source of the goods".  Id.  The statute generally applies the same principles concerning protection to both trademarks and service marks.  ACCU Personnel, Inc. v. Accustaff, Inc., 846 F.Supp. 1191, 1196 n.2 (D. Del. 1994).  Although this is a service mark case, for ease of reference, the Court will use the terms "mark" or "trademark" in this memorandum opinion.

symbol, or device, or any combination thereof, or any
false designation of origin, false or misleading
description of fact, or false or misleading
representation of fact, which—
    (A) is likely to cause confusion, or to cause
    mistake, or to deceive as to the affiliation,
    connection, or association of such person with
    another, or as to the origin, sponsorship, or
    approval of his or her goods, services, or
    commercial activities by another person
    . . . .
shall be liable in a civil action by any person who
believes that he or she is or is likely to be damaged
by such act.

15 U.S.C. § 1125(a)(1) (discussing unfair competition).[4]

The Lanham Act protects unregistered marks to the same
extent as registered marks because trademark rights emanate from
use and not merely registration.  Duffy v. Charles Schwab & Co.,
Inc., 54 U.S.P.Q.2d 1820, 1824 (D.N.J. 2000).  To prevail on a
trademark infringement claim for an unregistered mark, the
plaintiff must show that (1) the mark is valid and legally
protectable, (2) the plaintiff owns the mark, and (3) the
defendant's use of a similar mark is likely to create confusion
concerning the origin of the plaintiff's goods or services.
Freedom Card, Inc. v. J.P. Morgan Chase & Co., 432 F.3d 463, 470
(3d Cir. 2005); see Kos Pharm., Inc., 369 F.3d at 708-09; Fisons

---

    [4] Before the Lanham Act was codified, the contents of
Section 1125(a) appeared in Section 43(a) of Public Law 79-489.
See 79 Pub.L.No. 489, 60 Stat. 427 (1946).  As a result, this
provision is commonly referred to as Section 43(a) of the Lanham
Act.

15

Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994).[5]

### 1. Validity

Unregistered marks have no presumption of validity, unlike federally registered marks. See 15 U.S.C. § 1115(a); Duffy, 54 U.S.P.Q.2d at 1827 n.3. Thus, a plaintiff must prove that an unregistered mark is valid and protectable. Duffy, 54 U.S.P.Q.2d at 1827 n.3. An unregistered mark is only valid and legally protectable if the plaintiff shows that the mark is inherently distinctive or has secondary meaning. Id. at 1824.

Distinctiveness of a mark is measured by classifying the mark into one of four categories ranging from strongest to weakest, with strong marks receiving the greatest protection: "(1) arbitrary or fanciful (such as 'KODAK'); (2) suggestive (such as 'COPPERTONE'); (3) descriptive (such as 'SECURITY CENTER'); and (4) generic (such as 'DIET CHOCOLATE FUDGE SODA')." Freedom Card, Inc., 432 F.3d at 472 (quotation and citation omitted). Arbitrary or fanciful marks neither describe nor suggest anything about the product. Checkpoint Sys., Inc. v. Check-point Software Techs., Inc., 269 F.3d 270, 282 (3d Cir.

---

[5] This standard also applies to infringement claims brought under New Jersey law. Commerce Bancorp, Inc. v. BankAtlantic, 285 F.Supp.2d 475, 483 (D.N.J. 2003).

2001).  Suggestive marks suggest an idea of the qualities and characteristics of the goods, but require customer imagination, thought or perception to determine what the product is.  Id. Descriptive marks describe the intended purpose, function, use, size, or class of users of the goods, and convey an immediate idea of the qualities or characteristics of the goods.  Id. Generic marks function as the common descriptive name of a product class.  Id.

The first two categories are deemed "inherently distinctive", and thus, are entitled to the highest level of protection, at least in those geographic and product areas in which the senior user applies the mark to the goods.  Fisons Horticulture, Inc., 30 F.3d at 478; Duffy, 54 U.S.P.Q.2d at 1824.

Descriptive marks are less distinctive and thus are protected only if the mark has achieved "secondary meaning" in the relevant community at the time and place that the defendant began use of the mark.  Commerce Bancorp, Inc., 285 F.Supp.2d at 485; Duffy, 54 U.S.P.Q.2d at 1824.  Secondary meaning refers to consumer recognition that the mark identifies the source of the service or product.  Duffy, 54 U.S.P.Q.2d at 1824.  Factors that may be used to determine whether secondary meaning has been demonstrated include (1) the extent of sales and advertising leading to buyer association, (2) length of use, (3) exclusivity of use, (4) the fact of copying, (5) customer surveys, (6)

17

customer testimony, (7) the use of the mark in trade journals, (8) the size of the company, (9) the number of sales, (10) the number of customers, and (11) actual confusion.  Id. at 1825.

A generic term functions as the common descriptive name of a product or service class.  Id. at 1824.  Generic marks are nondistinctive and thus receive no protection because a party may not deprive competitors of the right to call a good or service by its name.  Id. at 1824-25.

### 2.  Ownership

A plaintiff must also prove ownership of the trademark. Duffy, 54 U.S.P.Q.2d at 1823.  When determining ownership of an unregistered trademark, the Court considers (1) priority of use, and (2) market penetration.  Colonial Elec. & Plumbing Supply of Hammonton, LLC v. Colonial Elec. Supply, Ltd., No. 05-5408, 2007 WL 4571105, at *5 (D.N.J. Dec. 27, 2007).  Priority of use is typically determined by prior appropriation.  ACCU Personnel, Inc., 846 F.Supp. at 1204.  As between two competing users, the senior user is typically the first to use the trademark anywhere in the United States.  Id. at 1204 n.12.  The junior user is the second user, regardless of whether the junior user adopts and uses a mark in a geographically remote location.  Id.  Thus, when the two users are competing in the same market, the trademark rights of the senior user will trump those of the junior user. Id. at 1204-05.

18

When the parties are operating in markets that are
geographically remote from each other, however, prior
appropriation is legally insignificant.  Id. at 1205.  This is
because trademark rights "grow out of use, not mere adoption."
Id. (quotation and citation omitted).  "No senior user . . . can
monopolize markets that [its] trade has never reached and where
the mark signifies not his goods but those of another."  Id.
(quotation and citation omitted).  Therefore, a senior user
enters a remote market subject to the trademark rights already
acquired, in good faith, by another user.  Id.  These principles,
known as the "Tea Rose-Rectanus" doctrine, govern the territorial
rights in unregistered trademarks.  Id. at 1205.[6]

A senior user must therefore show entitlement to trademark
protection in a particular market by providing evidence of (1)
market penetration in a particular market, (2) reputation in a
particular market, or (3) a "zone of natural expansion" extending
into a particular market.  Laurel Capital Group, Inc. v. BT Fin.
Corp., 45 F.Supp.2d 469, 482 (W.D. Pa. 1999).[7]

_____

   [6] This doctrine still governs territorial rights in
unregistered trademarks despite subsequent statutory activity.
ACCU Personnel, 846 F.Supp. at 1205.

   [7] The Third Circuit has neither expressly embraced nor
rejected the reputation theory and the zone of natural expansion
theory.  Schmidt v. Finish Line, Inc., No. 99-4025, 2000 WL
565216, at *4 n.4 (E.D. Pa. May 2, 2000).  Courts within the
Third Circuit, however, have endorsed both theories.  See, e.g.,
Commerce Bancorp, Inc., 285 F.Supp.2d at 501 n.13; Laurel Capital

19

### a.  Market Penetration

A party asserting trademark ownership must show "clear entitlement" to protection of a trademark in a particular market. Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1397 (3d Cir. 1985) (quotation and citation omitted).  Although the degree of market penetration cannot be precisely defined, market penetration of the senior user's trademark must be significant enough to pose a real likelihood of confusion among the consumers in that area.  ACCU Personnel, Inc., 846 F.Supp. at 1206.

Market penetration is analyzed under four factors as of the time the junior user first adopted and began using the trademark: (1) volume of sales; (2) positive and negative growth trends in the area; (3) the number of actual customers in relation to the potential number of customers; and (4) the amount of advertising in the area.  Natural Footwear Ltd., 760 F.2d at 1398-99.  Market

_____

Group, Inc., 45 F.Supp. at 482.  However, some courts within the Third Circuit have noted or implied that whether a senior user is entitled to protection is to be decided only under four factors of the market penetration theory.  See Colonial Elec. Supply, Ltd., 2007 WL 4571105, at *11 (noting that ownership extends only to areas where four factors of market penetration show that confusion is likely among consumers in area); Schmidt, 2000 WL 565216, at *4 n.4 (noting that four factors of market penetration test implicitly incorporate reputation and zone of natural expansion theories).  The Court will consider these two theories, as well as the market penetration test, as the parties have argued all three theories here.  (See Pl. Br.; Def. Br.; Pl. Reply Br.)

penetration is to be analyzed on the basis of natural trading area that may or may not be co-extensive with a state's borders. Id. at 1399.

b.    Reputation

The Court may also consider whether a senior user's reputation has penetrated a particular market area prior to the junior user's first use of the mark.  Laurel Capital Group, Inc., 45 F.Supp.2d at 482.  A user can build up an "identifiable public image" with activities conducted solely in that user's own market, yet have that image travel to other markets via advertising and word of mouth.  Id. at 492 (quotation and citation omitted).  This theory is an arm of the market penetration test because if a senior user's reputation has penetrated a market before the junior user's use, then the markets are not truly geographically remote.  Id. at 482.

c.    Zone of Natural Expansion

The Court may also evaluate whether that party is entitled to a zone of natural expansion if the party has failed to establish market penetration in a particular market.  Id. at 482; ACCU Personnel, Inc., 846 F.Supp. at 1208.  Under this theory, a senior user is entitled to trademark protection in those areas where the senior user is reasonably expected to expand, "if the senior user has constantly expanded its business by the date of the junior user's adoption of the mark, and if distances [between

the users' markets] are not great . . . even though no actual sales have yet been made in that area by the senior user." <u>ACCU Personnel, Inc.</u>, 846 F.Supp. at 1208 (quotation and citation omitted).

The zone of natural expansion tends to be defined narrowly, however, given that the theory is a "legal fiction", and precisely determining the potential zone of natural expansion is "impossible". <u>Laurel Capital Group, Inc.</u>, 45 F.Supp.2d at 493; <u>ACCU Personnel, Inc.</u>, 846 F.Supp. at 1208 (quotation and citation omitted).  Further, the zone of natural expansion does not necessarily include all areas into which the senior user has actually expanded, since that use may infringe upon the junior user's legitimate, superior use. <u>Laurel Capital Group, Inc.</u>, 45 F.Supp.2d at 493.

A mere hope of expansion is not sufficient to establish a zone of natural expansion. <u>ACCU Personnel, Inc.</u>, 846 F.Supp. at 1208.  Rather, when determining whether a junior user falls within the senior user's zone of natural expansion, the Court considers, as of the date the junior user adopted and used the mark, (1) the geographic distance from the senior user's actual location to the perimeter of the claimed zone, (2) the nature of the business and the size of the senior user's zones of market penetration and reputation, (3) the history of the senior user's expansion and assessment as to when the senior user could

22

potentially reach the zone the senior user claims, and (4) whether it would take a "great leap forward" for the senior user to enter the zone; that is, whether expansion into the claimed zone is the next logical step. <u>Laurel Capital Group, Inc.</u>, 45 F.Supp.2d at 493 (quotation and citations omitted); <u>ACCU Personnel, Inc</u>., 846 F.Supp. at 1209. Further, "reliance on regional economic relationships" between various zones is not, by itself, sufficient to establish a zone of natural expansion. <u>See ACCU Personnel, Inc.</u>, 846 F.Supp. at 1209. Rather, the proper inquiry is into what regions the senior user actually planned to expand at the time the junior user adopted and began using the mark. <u>See</u> <u>id.</u>

### d.   Good Faith

If a senior user cannot prove entitlement to trademark protection under one of the theories discussed <u>supra</u>, a junior user is entitled to trademark protection in the junior user's market if the mark was adopted and used in good faith. <u>Id.</u> at 1209. The Third Circuit has not yet resolved the question of whether a junior user's prior knowledge of the senior user's trademark, standing alone, compels a finding of bad faith. <u>See Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.</u>, 186 F.3d 311, 318 (3d Cir. 1999) ("[W]e have not decided whether a junior user's knowledge of the senior user's use of a mark is sufficient to attribute bad faith adoption of the mark"). However, within

the Third Circuit, at least one court has held that "a junior user's prior knowledge of a senior user's trademark is probative of, but not dispositive of, the question whether the junior user acted in bad faith." ACCU Personnel, Inc., 846 F.Supp. at 1211; see also Commerce Bancorp, Inc., 285 F.Supp.2d at 500 (holding that issue of fact remained as to junior user's good faith use of trademark, as it was unclear whether evidence of defendant's prior knowledge was sufficient to show bad faith).

### 3.    Likelihood of Confusion

If the senior user demonstrates superior rights in the mark in the relevant geographic area, then the senior user must demonstrate that the junior user's use of the mark to identify goods or services is likely to cause confusion concerning the origin of the goods or services. Duffy, 54 U.S.P.Q.2d at 1824.

A likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. Freedom Card, Inc., 432 F.3d at 470. A plaintiff can assert that there is a likelihood of "direct confusion" or a likelihood of "reverse confusion". Id. A direct confusion claim arises when "a junior user of a mark attempts to free-ride on the reputation and goodwill of the senior user by adopting a similar or identical mark." Id. In contrast, reverse confusion arises "when a larger, more powerful

24

company uses the trademark of a smaller, less powerful senior
owner and thereby causes likely confusion as to the source of the
senior user's goods or services." Id. at 471 (quotation and
citation omitted).  Thus, in a case involving reverse confusion,
the junior user overwhelms the senior user, and the public
eventually assumes that either the senior user's products are the
junior user's products, or the senior user is directly connected
to the junior user.  Id.  The result of reverse confusion is that
"the senior user loses the value of the trademark - its product
identity, corporate identity, control over its goodwill and
reputation, and ability to move into new markets." Id. (citation
omitted).

    The Third Circuit has adopted a non-exhaustive list of
factors to consider when evaluating whether a likelihood of
confusion exists in a direct confusion case.  Id. at 470-71.  The
Court must rely on those factors that are appropriate to the
given situation.  Kos Pharm, Inc., 369 F.3d at 709.  None of
these factors is determinative.  Id.

    The factors are (1) the degree of similarity between the
senior user's mark and the alleged infringing mark, (2) the
conceptual and commercial strength of the senior user's mark, (3)
the price of the goods and other factors indicative of the care
and attention expected of consumers when making a purchase, (4)
the length of time the junior user has used the mark without

25

evidence of actual confusion arising, (5) the intent of the junior user in adopting the mark to "ride on the goodwill of the senior user's mark", (6) the evidence of actual confusion, (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media, (8) the extent to which the targets of the parties' sales efforts are the same, (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors, and (10) other facts suggesting that the consuming public might expect the senior user to (i) manufacture both products, (ii) manufacture a product in the junior user's market, or (iii) expand into the junior user's market.  Freedom Card, Inc., 432 F.3d at 470-73; A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 215 (3d Cir. 2000).[8]

Some of these factors are analyzed slightly differently when reverse confusion is at issue.  Freedom Card, Inc., 432 F.3d at 472.  First, analysis of the strength of the two marks in a reverse confusion case focuses on the commercial strength of the junior user's mark, and the conceptual strength of the senior user's mark.  Id. at 472-73.  Also, analysis of the junior user's

---

[8] These factors were originally set forth in Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).  As a result, they are commonly referred to as the "Lapp factors".  Freedom Card, Inc., 432 F.3d at 471.

intent focuses on an intent to exploit confusion to push the
senior user out of the market.  Id. at 473.  Also, evidence of
actual confusion in a reverse confusion case may include evidence
that the public thought the junior user was the source of the
senior user's product, although "isolated instances of 'direct'
confusion may occur in a reverse confusion case, and vice-versa."
Id. (quotation and citation omitted).  Further, the Court may
examine other facts suggesting that the public might expect the
larger, more powerful company to (i) manufacture both products,
(ii) manufacture a product in the senior user's market, or (iii)
expand into the senior user's market.  Freedom Card, Inc., 432
F.3d at 473-74.

## II.  Legal Standards Applied Here

### A.  Reasonable Likelihood of Success on the Merits

Plaintiff alleges that defendants, inter alia, infringed the
First Mark in violation of the Lanham Act and New Jersey common
law.  (See Compl.)  The Court finds that plaintiff has not
demonstrated a reasonable likelihood of success on the merits
with respect to these claims.

#### 1.  The First Mark is Valid and Legally Protectable

Plaintiff argues that the First Mark is valid and legally
protectable because it is inherently distinctive.  (Pl. Br., at
8-9.)  Plaintiff states that although the term "wine" is
descriptive, the term "king" is arbitrary, fanciful, or
suggestive; thus, the combined term WINE KING is fanciful or

27

suggestive.  (Id.)  Defendants do not dispute that plaintiff's
mark is valid and legally protectable.  (See Def. Br.)  Further,
the state of New Jersey issued a trademark to defendants.  (Decl.
of Venkata Indukuri, at ¶ 7.)  The fact that defendants sought
trademark protection for an identical mark "inherently
acknowledges" that defendants also believe that the First Mark is
valid and protectable.  See Colonial Elec. Supply, Ltd., 2007 WL
4571105, at *4.

        "A term is descriptive if it forthwith conveys an immediate
idea of the ingredients, qualities, or characteristics of the
goods [or services].  If the mental leap between the word and the
product's [or service's] attributes is not almost instantaneous,
this strongly indicates suggestiveness, not direct
descriptiveness."  Vista India v. Raaga, LLC, 501 F.Supp.2d 605,
617 (D.N.J. 2007) (quotations and citations omitted).  The Court
finds that the First Mark is suggestive, as it suggests rather
than describes the characteristics of plaintiff's services; it is
not immediately apparent from the combination of "Wine" and
"King" what services plaintiff provides.  See id.  Thus,
plaintiff has established the first element of its trademark
infringement claims under the Lanham Act and New Jersey common
law.

        Even if the Court were to find that the First Mark is merely
descriptive, however, the First Mark is protectable because it
had achieved secondary meaning in plaintiff's geographic area at

28

the time and place that defendants began using the Second Mark.
Plaintiff first began using the name "WINE KING" in 1998 to
identify its store.  (Decl. of Michael Vekshteyn, at ¶ 2.)
Plaintiff began using the First Mark in 2001.  (Id. at ¶ 3.)
Plaintiff's sales have been in excess of $10 million per year to
over 13,000 customers located primarily in the northern New
Jersey area.  (Id. at ¶¶ 4, 6; Decl. of Peter J. Sheehan, Ex.,
Customer Database.)  Plaintiff's advertising via print media in
newspapers and flier inserts occurred primarily when its stores
opened.  (Decl. of Michael Vekshteyn, at ¶ 4; 2-13-08 Oral Arg.)
However, the First Mark also acts as an advertisement in
plaintiff's geographic area, as it is affixed onto the stores as
signage, and is visible to potential customers traveling on the
nearby highways.  (2-13-08 Oral Arg.)  Thus, the (1) extent of
plaintiff's sales and advertising, (2) length of use of the First
Mark, (3) number of sales, and (4) number of customers in the
region of northern New Jersey shows that the First Mark has
achieved secondary meaning in at least Bergen and Morris
counties.  See Duffy, 54 U.S.P.Q.2d at 1825.

### 2.   Plaintiff Has Not Established a Likelihood of Direct Confusion in Defendants' Geographic Market

No party had successfully registered its mark either
federally or with the State of New Jersey by the time defendants
began using the Second Mark when they opened their store on
November 16, 2007.  See Record of Plaintiff's Trademark

Application, at FEDTM 77333384; Record of Defendants' Trademark Registration, at NJTM 22933.  Thus, as users of unregistered marks, their respective territorial rights to their marks will be analyzed under the "Tea Rose-Rectanus" doctrine.  See ACCU Personnel, Inc., 846 F.Supp. at 1205.

Plaintiff is the senior user here, as it began to use the First Mark in 2001, and defendants did not begin to use the Second Mark until 2007.  (Decl. of Michael Vekshteyn, at ¶ 3; Decl. of Venkata Indukuri, at ¶ 8.)  Prior appropriation of the First Mark does not resolve the issue of ownership, however, because the parties have used their marks in different geographic areas within New Jersey.  See ACCU Personnel, Inc., 846 F.Supp. at 1205.  Defendants argue that plaintiff has not penetrated their market, as (1) plaintiff's stores are located in different counties, between sixty-five and seventy-three miles from defendants' store, (2) the number of plaintiff's customers residing in defendants' market is de minimis, (3) plaintiff's "vague hope" of expanding into defendants' market is insufficient to establish trademark protection in that market, and (4) defendants did act in good faith when they searched for uses of the Second Mark.  (Def. Br., at 9-12; 2-13-08 Oral Arg.)  Plaintiff contends that (1) its reputation has extended into defendants' market by virtue of sales to customers residing in defendants' market, (2) its zone of natural expansion extends

30

into defendants' market, and (3) defendants did not act in good faith when they adopted the Second Mark, as their search for uses of the Second Mark was inadequate.  (Pl. Reply Br., at 4-8.)

### a.   Plaintiff Has Not Penetrated Defendants' Geographic Market

Plaintiff does not appear to contend that it has penetrated defendants' market by actual sales in defendants' market.  (See Pl. Reply Br.; 2-13-08 Oral Arg.)  Plaintiff has not penetrated defendants' market, as analyzed under the four factors of the market penetration test.  See Natural Footwear Ltd., 760 F.2d at 1398-99.

### i.   Volume of Sales

Plaintiff concedes that it does not actually make sales in defendants' market, as its stores are located in Bergen and Morris counties.  (Decl. of Michael Vekshteyn, at ¶ 5; 2-13-08 Oral Arg.)  "When sales activity does not exceed even a minimum threshold level, a court may properly conclude that market penetration simply has not been demonstrated."  Natural Footwear Ltd., 760 F.2d at 1400.

### ii.  Growth Trends

Plaintiff has put forth evidence of positive growth trends generally, as plaintiff has expanded the number of stores from one to three since 1998.  (Decl. of Michael Vekshteyn, at ¶¶ 2-3.)  However, these stores are located in the same geographic area of northern New Jersey.  (Id. at ¶ 5.)  Plaintiff asserts

31

that "there is a reasonable expectation" that it will expand into defendants' market, given that it has customers residing in those areas, and that it has customers traveling to defendants' market. (Pl. Reply Br., at 4-5.)  However, plaintiff also concedes that it has no "concrete" plans to expand into defendants' market. (2-13-08 Oral Arg.)  Thus, plaintiff has not provided evidence of positive growth trends into defendants' market.

### iii. Actual Customers and Potential Customers

Plaintiff serves at least 13,000 customers throughout New Jersey and other states.  (Decl. of Michael Vekshteyn, at ¶ 4; Decl. of Peter J. Sheehan, Ex., Customer Database.)  The vast majority of these customers, however, reside in Bergen County and Morris County, where the three retail stores are located, and in surrounding counties.  (See Customer Database, at 1-126 (listing approximately 5300 Bergen County residents), 145-317 (listing approximately 7300 Morris County residents), 135-41 (listing approximately 200 Hudson County residents), 336-46 (listing approximately 400 Passaic County residents), 127-34 (listing approximately 300 Essex County residents).)

The number of actual customers in counties beyond northern New Jersey are far fewer.  (See id. at 144 (listing twenty-three Monmouth County residents), 334 (listing eleven Ocean County residents), 142-43 (listing twelve Mercer County residents), 143-44 (listing forty Middlesex County residents), 127 (listing one Burlington County resident).)  Further, plaintiff has not put

32

forth evidence of the number of potential customers located beyond northern New Jersey.

### iv.  Amount of Advertising in Area

Plaintiff has not shown that it engages in advertising in defendants' market.  Plaintiff engaged in print media advertising in the form of newspaper advertisements and flier inserts circulated throughout New Jersey when the second and third retail stores opened in 2001.  (Decl. of Michael Vekshteyn, at ¶ 4.) However, it is unclear where exactly in New Jersey these advertisements were distributed and for how long.  (See id.) Moreover, plaintiff concedes that its advertising primarily consists of advertisement on the stores themselves, visible from nearby highways.  (2-13-08 Oral Arg.)  Plaintiff's webpage also is not yet functioning.  (Id.)  See http://thewineking.com (last visited March 10, 2008).

### b.  Plaintiff's Reputation Does Not Extend Into Defendants' Geographic Market

Plaintiff does serve customers who reside in defendants' geographic market, as discussed supra.  Moreover, this Court recognizes that New Jersey is a "corridor" state, and that customers of both parties' stores may travel frequently between plaintiff's market and defendants' market.  See Wiener King, Inc. v. Wiener King Corp., 192 U.S.P.Q. 353, 355 (3d Cir. 1976) (noting district court's judicial notice of fact that New Jersey was a "corridor" state).

The fact that some customers residing a significant distance from plaintiff's stores in Bergen and Morris counties happen to patronize one of plaintiff's stores does not prove, however, that plaintiff's reputation zone encompasses the towns or counties these customers reside in.  See id. at 356-57 (directing district court to modify order granting preliminary injunction for entire state of New Jersey, because "the nexus between proof of residence [of plaintiff's customers] and proof of reputation" was missing, as "[m]any may have patronized plaintiff's facilities for reasons wholly unrelated to plaintiff's reputation").

Plaintiff has not put forth any evidence showing that those residing in defendants' market patronized plaintiff's stores because of plaintiff's reputation.  See id. at 356.  Likewise, the fact that some of plaintiff's customers may travel to defendants' market does not establish that plaintiff's reputation is thereby extended to defendants' market by word of mouth, or otherwise.  See Laurel Capital Group, Inc., 45 F.Supp.2d at 492. Moreover, plaintiff's reputation has not reached defendants' market via advertising, as plaintiff does not advertise in defendants' market, as discussed supra.

> **c.   Plaintiff's "Zone of Natural Expansion" Does Not Extend Into Defendants' Geographic Market**

Plaintiff has not shown it is entitled to a "zone of natural expansion" into defendants' market.  The geographic distance between plaintiff's store locations and defendants' market is

approximately seventy miles.  (Dkt. entry no. 8, Decl. of Cindy
D. Salvo, at ¶ 2.)  Thus, there is no substantial geographic
distance involved here.  See Laurel Capital Group, Inc., 45
F.Supp.2d at 493 (noting that less than 100 mile distance between
users' markets was not a substantial geographic distance).
However, the size of plaintiff's market penetration and
reputation is limited to northern New Jersey, as discussed supra.
Further, although plaintiff does have a history of expansion, as
it has opened two additional stores since it opened its first
store in 1998, this expansion has been limited to Bergen County
and Morris County.  (Decl. of Michael Vekshteyn, at ¶¶ 2-3.)

     The mere hope of expansion, moreover, is not adequate to
establish a zone of natural expansion.  ACCU Personnel, Inc., 846
F.Supp. at 1208.  Further, "reliance on regional economic
relationships" alone is misplaced.  See id. at 1209.  Rather, the
proper inquiry is into what regions did plaintiff actually plan
to expand at the time defendants adopted and began using the
Second Mark.  See id.  As a result, plaintiff's reliance on the
fact that New Jersey residents travel frequently between the
parties' markets does not establish that it is entitled to a zone
of natural expansion into defendants' market.  See id.  Moreover,
plaintiff concedes that it has no concrete plans to expand into
defendants' market.  (2-13-08 Oral Arg.)

     It may not be a "great leap forward" for plaintiff to enter
defendants' market in theory, given the relatively insubstantial

distance between the two markets.  However, plaintiff's limited market penetration, reputation, and history of expansion, along with plaintiff's lack of concrete plans to further expand into defendants' market, shows that plaintiff is not entitled to a zone of natural expansion into defendants' market.  See Laurel Capital Group, Inc., 45 F.Supp.2d at 493; ACCU Personnel, Inc., 846 F.Supp. at 1208-09.

### d.   Plaintiff Has Not Established that Defendant Did Not Act in Good Faith

Plaintiff argues that defendants did not act in good faith when they adopted and began using the Second Mark.  (Pl. Reply Br., at 7-8.)  Specifically, plaintiff contends that Indukuri's "wrongful assumption and reliance" on Kosek's report that the "WINE KING" name was available both as a name and a trademark is "wholly unrealistic".  (Id. at 8.)  Plaintiff also points to the name of defendants' Internet webpage as evidence that defendants knew of plaintiff's stores, as "[w]ithout doubt, Indukuri would have preferred the domain name without the hyphen and any searches related to obtaining ownership of that domain would have resulted in [d]efendants learning of [plaintiff's] Wine King stores via Google searches and Superpages searches."  (Id.) Plaintiff also argues that the fact that defendants obtained a trademark from the state of New Jersey after plaintiff sent defendants the cease and desist letter is evidence of bad faith. (2-13-08 Oral Arg.)

36

Defendants maintain that Indukuri did not know of
plaintiff's stores until Indukuri received the cease and desist
letter from plaintiff on November 21, 2007. (Decl. of Venkata
Indukuri, at ¶ 4.) Further, defendants contend that even if
Kosek had performed a trademark search, Indukuri would not have
learned of the First Mark, as it was not registered federally or
with the state of New Jersey at the time the search was
conducted. (Def. Br., at 5.)

Plaintiff has not shown that defendants did not act in good
faith here. It is disputed whether defendants even had knowledge
of plaintiff's use of the First Mark prior to when defendants
opened their store on November 16, 2007, as discussed <u>supra</u>.
Moreover, plaintiff has not pointed to any authority to support
an assertion that carelessness alone supports a finding of lack
of good faith. (<u>See</u> Pl. Reply Br.)[9]  Further, the fact that

---

[9] The Third Circuit has noted that it would apply "the test
in <u>Fisons</u>", and "would consider" whether a junior user was
careless in searching for uses of a mark when determining whether
the junior user adopted and used the mark in good faith. <u>See</u>
<u>Lucent Info. Mgmt., Inc.</u>, 186 F.3d at 318 n.10. In <u>Fisons</u>, the
Third Circuit analyzed the "intent to confuse" <u>Lapp</u> factor in a
reverse confusion case, noting that a defendant's carelessness
was relevant when analyzing that defendant's intent in adopting a
mark. <u>See</u> <u>Fisons Horticulture, Inc.</u>, 30 F.3d at 480. However,
the Third Circuit has since explicitly noted that it has not
adopted carelessness as the standard for analyzing the "intent to
confuse" <u>Lapp</u> factor in a reverse confusion case. <u>See</u> <u>Freedom</u>
<u>Card, Inc.</u>, 432 F.3d at 480; <u>A & H Sportswear, Inc.</u>, 237 F.3d at
232-33. Thus, the Court will not adopt the principle that mere
carelessness is sufficient to find that a junior user did not
adopt and use a mark in good faith.

defendants obtained a trademark from the state of New Jersey
after plaintiff sent them the cease and desist letter is not
evidence of bad faith, as the relevant point in time is whether
defendants acted in good faith when they first adopted and used,
not registered, the Second Mark.  See ACCU Personnel, 846 F.Supp.
at 1209.

### e.    Summary of Findings

The Court finds that plaintiff has not established that the
market penetration of the First Mark in defendants' geographic
market is significant enough to pose a real likelihood of direct
confusion among the consumers in that area, as (1) plaintiff does
not make sales in defendants' market, (2) plaintiff has not
provided evidence of positive growth trends into defendants'
market, (3) the vast majority of plaintiff's customers reside
within plaintiff's market, and plaintiff has not put forth
evidence of the number of potential customers located beyond its
market, and (4) plaintiff does not engage in advertising in
defendants' market.

Plaintiff also has not provided sufficient evidence showing
that its reputation extends into defendants' market so that there
is a real likelihood of direct confusion among the consumers in
that area.  Moreover, because of plaintiff's limited market
penetration, reputation, and history of expansion, along with a
lack of concrete plans to expand into defendants' market,
plaintiff is not entitled to a zone of natural expansion into

defendants' market.  Further, there is a lack of sufficient
evidence here showing that defendants lacked good faith when they
adopted and used the Second Mark.

### 3.    Plaintiff Has Not Established a Likelihood of Reverse Confusion in Plaintiff's Geographic Market

Plaintiff has not established that the market penetration of
the First Mark in defendants' geographic area is significant
enough to pose a real likelihood of direct confusion among the
consumers in that area, as discussed <u>supra</u>.  See <u>ACCU Personnel,
Inc.</u>, 846 F.Supp. at 1206.  Plaintiff also asserts, however, that
defendants' use of the Second Mark will result in reverse
confusion in plaintiff's market.  (Pl. Reply Br., at 12-15.)  The
Court, however, finds that plaintiff has not established a
likelihood of reverse confusion in its market.[10]

### a.    Degree of Similarity

The degree of similarity between the marks at issue is the
most important <u>Lapp</u> factor.  <u>Fisons Horticulture, Inc.</u>, 30 F.3d

---

[10] As discussed <u>supra</u>, the First Mark is valid and
protectable.  Further, plaintiff has penetrated its own
geographic market, as (1) plaintiff's sales have been in excess
of $10 million per year, (2) plaintiff has expanded from one to
three stores over ten years in northern New Jersey, (3) there are
over 13,000 customers located primarily in Bergen and Morris
counties and (4) plaintiff advertises in the area by using the
First Mark as signage on its stores, visible to potential
customers traveling on nearby highways.  (Decl. of Michael
Vekshteyn, at ¶ 4, 6; Decl. of Peter J. Sheehan, Ex., Customer
Database; 2-13-08 Oral Arg.)  Defendants do not dispute that
plaintiff has penetrated its own geographic market.  (<u>See</u> Def.
Br.)

at 476.  "[I]f the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'"  Id. at 478 (citations omitted).  Here, as the marks are both "WINE KING", and thus are identical, the overall impression created by the First Mark and the Second Mark is the same.  Therefore, this factor supports plaintiff's assertion  that reverse confusion is likely if defendants are permitted to use the Second Mark in plaintiff's geographic market.

### b.   Strength

The strength of the two marks at issue, however, does not indicate that reverse confusion is likely.  In evaluating the strength of the First Mark with regard to reverse confusion, the Court is to examine the conceptual strength of the First Mark with the commercial strength of the Second Mark.  See Freedom Card, Inc., 432 F.3d at 473.  When examining the commercial strength of the Second Mark, the Court is to (1) compare the commercial strength of the Second Mark as compared to the First Mark, and (2) determine whether the defendants have employed a marketing or advertising campaign that has saturated public awareness of defendants' mark.  See id. at 472.

The First Mark is conceptually strong, as it is "suggestive", as discussed supra.  Plaintiff argues that the Second Mark is commercially strong, pointing to defendants' (1)

40

"aggressive advertising campaign", consisting of advertisements in the Asbury Park Press, The Coast Star, radio and television advertisements, and advertisements on the Internet, and (2) alleged plans to open a store in Marlboro, New Jersey, which is less than fifty miles from plaintiff's store located in Hacksensack, New Jersey.  (Pl. Reply Br., at 12-15).

Defendants, however, note that the radio and newspaper advertisements do not extend into plaintiff's market.  (2-13-08 Oral Arg.)  Further, defendants note that there are "no plans whatsoever" to open a new store in Marlboro, New Jersey.  (Dkt. entry no. 10, Def. 1-16-08 Letter, Ex. A, Surreply Decl. of Venkata Indukuri, at ¶ 5.)  Defendants also assert that they have not "scouted any locations" for a new store, nor applied for a new liquor license.  (Id.)  Further, defendants have instructed their employee responsible for the MySpace webpage to remove any information related to an opening in Marlboro, New Jersey.  (Id. at ¶ 7.)

The First Mark also is commercially strong in plaintiff's geographic market.  As discussed supra, plaintiff's three stores serve over 13,000 customers within the northern New Jersey area, primarily in Bergen and Morris counties.  (Decl. of Michael Vekshteyn, at ¶ 5; Decl. of Peter J. Sheehan, Ex., Customer Database.)  The volume of sales at plaintiff's stores also has been in excess of $10 million per year.  (Decl. of Michael

41

Vekshteyn, at ¶ 6.)  Moreover, as discussed supra, plaintiff
engages in advertising in its market through use of signage on
its stores, visible to potential customers traveling on nearby
highways.  (2-13-08 Oral Arg.)

Defendants do not operate a store in either Bergen or Morris
County.  (See Decl. of Venkata Indukuri, at ¶ 1.)  Further, as
discussed supra, defendants do not plan to open a store in
Marlboro, New Jersey.  (Surreply Decl. of Venkata Indukuri, at ¶
5.)  Moreover, even if defendants did have such plans, Marlboro
is located in Monmouth County, the same county where defendants'
store is located.  (Decl. of Venkata Indukuri, at ¶ 1.)

Defendants' advertising also primarily occurs in the region
of southern New Jersey.  Defendants' MySpace webpage indicates
that a television commercial will air in Monmouth County.  (See
Neil B. Friedman, Ex. A, MySpace Webpage.)  The Asbury Park Press
is primarily distributed to Burlington, Mercer, Middlesex,
Monmouth, Ocean, and Union counties.  (Id., Ex. B, Asbury Park
Press Circulation Records.)  Thus, Union County is the only
surrounding county where the paper is primarily distributed.
(See id.)  There is only miscellaneous distribution in other
counties.  (Id.)  The Coast Star is similarly regional.  See
http://starnewsgroup/about_us.html, noting that The Coast Star
serves the "southern Monmouth County area" (last visited March
10, 2008).  Further, the radio advertisements are primarily

42

limited to Monmouth County.  (2-13-08 Oral Arg.)  Defendants do, however, have an Internet webpage that is functional.  See http://wine-king.com (last visited March 10, 2008).

Plaintiff contends that (1) one can apparently receive home delivery of the Asbury Park Press in Bergen County by request, and (2) the radio program defendants advertise on can be heard in Somerset County.  (Decl. of Neil B. Friedman, at ¶ 3; 2-13-08 Oral Arg.)  This minimal amount of advertising in plaintiff's market, or in the proximity of plaintiff's market, and on the Internet via defendants' website and MySpace webpage, however, does not establish that defendants' use of the Second Mark has saturated plaintiff's market with awareness of that mark. Therefore, although the First Mark is conceptually strong, a comparison of the First Mark's commercial strength with the commercial strength of the Second Mark in plaintiff's market does not suggest that reverse confusion is likely here.

### c.    Expected Care and Attention of Consumers

Confusion is not considered likely "when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions."  Kos Pharm., Inc., 369 F.3d at 715. Consumers typically do not exercise a high degree of care when purchasing a relatively low cost item, such as a bottle of alcohol.  Dunhill of London, Inc. v. Kasser Distillers Prods.

<u>Corp.</u>, 175 U.S.P.Q 586, 601-02 (E.D. Pa. 1972).  Accordingly, this factor weighs in favor of plaintiff.

### d. Channels of Trade, Advertisements, and Targets of Sales Efforts

"The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." <u>Kos Pharm., Inc.</u>, 369 F.3d at 722.  This is a fact-specific inquiry that involves examination of the media the parties use to market their products and services, as well as the manner in which the parties use their sales forces.  <u>Id.</u>  Further, there is a greater likelihood of confusion if the parties target their sales efforts at the same customers.  <u>Id.</u>  Neither customer sophistication nor the relationship of the goods and services at issue is relevant in determining whether they are marketed through the same channels, advertised through the same media, or targeted at the same consumers because other <u>Lapp</u> factors take those considerations into account.  <u>Id.</u>

Plaintiff's current advertising and marketing campaign consists of advertising via store signage and an Internet webpage as discussed <u>supra</u>.  Plaintiff also offers a "bonus incentive program", which offers discounted prices on products in plaintiff's stores to members of the program.  (Decl. of Michael Vekshteyn, at ¶ 4.)  Defendants' marketing and advertising campaign consists of newspaper, radio, and television

44

advertisements, as well as advertisement via defendants' MySpace webpage and a general webpage, as discussed supra.  Defendants also use signage and a highway billboard to advertise their store.  (Decl. of Venkata Indukuri, at ¶ 9.)  Thus, there are some similarities between the parties' campaigns here that weigh in favor of reverse confusion.

Defendants argue that, given the distance between the parties' markets, "plaintiff's customers will likely never patronize, nor even see, [d]efendants' store."  (Def. Br., at 16.)  The parties' advertising and marketing campaigns do target purchasers of alcohol and alcohol-related products in their respective markets.  However, this Court notes that potential customers may frequent both markets while traveling in New Jersey, and thus could be the target of both campaigns.  The "sales target" factor therefore weighs in favor of reverse confusion.

### e.   Length of Time & Actual Confusion

Plaintiff offers evidence of only three instances of actual confusion on the part of plaintiff's suppliers.  (Decl. of Michael Vekshteyn, at ¶ 8; dkt. entry no. 14, Decl. of James A. Mathews, at ¶ 5-6; dkt. entry no. 16, Pl. 2-29-08 Letter.)  However, plaintiff has not offered any evidence of actual confusion on the part of (1) plaintiff's customers, mistakenly assuming defendants' store is connected to plaintiff's stores, or

45

(2) defendants' customers, mistakenly assuming plaintiff's store is connected to defendants' store.  See Freedom Card Inc., 432 F.3d at 473 (noting that there is "no strict prohibition against using 'direct' confusion evidence in a 'reverse confusion' case, or vice-versa").  Defendants only began using the Second Mark in November 2007, and thus, evidence of actual confusion may surface after more time has passed.  At present, however, these factors weigh in favor of defendants.

### f.   Defendants' Intent

The "intent to confuse" factor changes in the reverse confusion context "from the deliberate intent to palm off or exploit the good will of the senior user's mark (deliberate confusion), to the deliberate intent to push the senior user out of the market (reverse confusion)."  Id. at 479 (citations omitted).

Plaintiff argues that defendants were "clearly careless as no competent searches" of the name "WINE KING" were conducted. (Pl. Reply Br., at 14.)  Specifically, plaintiff argues that defendants failed to conduct a search (1) on the Internet website Google, and (2) of the New Jersey Yellow Pages.  (Pl. Br., at 11.)  However, although mere carelessness can weigh in favor of plaintiff here, it is not dispositive.  See Fisons Horticulture, Inc., 30 F.3d at 480; but see Freedom Card, Inc., 432 F.3d at 480 (noting that although Fisons implies that mere carelessness could

46

weigh in plaintiff's favor in reverse confusion case, Third
Circuit has not yet adopted "carelessness" as standard for
analyzing intent to confuse).

Plaintiff has not put forth any additional evidence of
defendants' intent when they adopted and began using the Second
Mark.  Further, defendants have put forth evidence that they did
investigate and evaluate their proposed mark, and had no
knowledge of the First Mark prior to receiving plaintiff's cease
and desist letter.  (Decl. of Venkata Indukuri, at ¶¶ 2, 4.)
Moreover, even assuming plaintiff is correct in arguing that
defendants' search was careless, a search for a registered
trademark, either federally or in the state of New Jersey, would
not have revealed plaintiff's use of the First Mark, as
plaintiff's trademark is unregistered.  (Def. Br., at 5.)
Therefore, although there is evidence that defendants did not
adequately search for use of the name "WINE KING", it is not
enough to show that defendants had the requisite intent to push
plaintiff out of its market.  See Freedom Card, Inc., 432 F.3d at
479.

### g.   Relationship of Services in Consumers' Minds

"This factor focuses on the nature of the products
themselves, asking whether it would be reasonable for consumers
to associate them or see them as related."  Kos Pharm., Inc., 369
F.3d at 723.  The parties both operate retail stores that offer

47

alcohol and alcohol related products; thus, their services are identical.  Therefore, this factor weighs in favor of reverse confusion.

### h.    Other Factors

Plaintiff states that (1) "[d]efendants are advertising in one of New Jersey's largest daily newspapers, the Asbury Park Press", (2) "[Defendants have] announced plans to open a second store in Marlboro, [New Jersey]", and (3) "[Defendants plan] to launch an internet site using the URL wine-king.com."  (Pl. Reply Br., at 15.)  Plaintiff argues that these facts suggest that the consuming public might expect defendants to (i) provide both services, (ii) serve plaintiff's market, or (iii) expand services into plaintiff's market.  (Id.)  The Court, however, has addressed all of these arguments supra; thus, the Court will not address them again.

### i.    Balancing the Factors

The Court finds that plaintiff has not established a likelihood of reverse confusion here.  The degree of similarity between the First Mark and the Second Mark does weigh in favor of finding that the likelihood of confusion exists.  Further, the First Mark is conceptually strong, as it is suggestive, and thus deserves protection.  The factors involving expected care and attention of consumers, the similarity of the parties' advertising and marketing campaigns, the possible overlap of the

48

parties' sales targets, and the relationship of the services in consumers' minds also weigh in favor of reverse confusion.

Comparison of the commercial strength of the First Mark and the Second Mark in plaintiff's market, however, strongly weighs against reverse confusion.  Length of time without actual confusion and the lack of evidence of actual confusion among customers also weighs against reverse confusion.  Further, defendants' intent in adopting the Second Mark also weighs against finding a likelihood of reverse confusion.  Thus, upon balancing all the applicable factors, this Court finds that defendants' use of the Second Mark is not likely to create reverse confusion in plaintiff's market concerning the origin of plaintiff's services.

**B.   Irreparable Injury**

"Once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury."  Kos Pharm. Inc., 369 F.3d at 726 (quotation and citation omitted).  Thus, "trademark infringement amounts to irreparable injury as a matter of law."  Id. (quotations and citations omitted).  As discussed supra, plaintiff has not demonstrated a likelihood of direct or reverse confusion here; thus, it is not presumed that plaintiff will be irreparably harmed if defendants are permitted to continue using the Second Mark.  See id.

49

Plaintiff also asserts that injunctive relief is necessary to prevent loss of control of reputation, loss of trade, and loss of goodwill because (1) plaintiff cannot control the quality of defendants' services, and (2) there is a risk that the "inferior quality" of defendants' services will cause "consumer alienation and dissatisfaction among loyal and potential MNI consumers". (Pl. Br., at 15.)  As discussed <u>supra</u>, however, plaintiff has not shown that it has penetrated defendants' market so that defendants' use of the Second Mark is likely to affect plaintiff's reputation, goodwill, or trade.  Further, as also discussed <u>supra</u>, plaintiff has also not shown that defendants have saturated plaintiff's market so that plaintiff's reputation, goodwill, or trade in its geographic market will be adversely affected by defendants' use of the Second Mark.

### C.   Harm to Defendants

Defendants assert that granting the preliminary injunction would cause it significant injury because "[i]t would take weeks, and a great deal of money, to create new signage, and any and all promotional items would need to be redone."  (Def. Br., at 18.) Plaintiff asserts that the harm to defendants does not outweigh the harm to plaintiff because (1) defendants have only recently opened their store, (2) defendants cannot claim hardship caused by difficulties they have brought upon themselves, and (3) any

potential financial damage to defendants can be compensated with a bond.  (Pl. Br., at 15-16; 2-13-08 Oral Arg.)

It cannot be said that defendants brought the injury upon themselves.  Although plaintiff asserts that defendants were careless in their search for uses of the name "WINE KING", defendants did perform a search for the name, and assert that they did not have knowledge of plaintiff's stores until they received a cease and desist letter from plaintiff, as discussed supra.  Further, as the First Mark was not registered, either federally or with the state of New Jersey, a trademark search would not have revealed plaintiff's use of the First Mark, as discussed supra.  See Kos Pharm., Inc., 369 F.3d at 728-29 (explaining that defendant took deliberate risk when it proceeded despite being warned that its mark was dangerously close to mark of competitor).

Defendants' alleged harm is compensable by money damages if plaintiff does not prevail on its claims.  See id. at 728.  Specifically, the costs in time and money associated with adopting a new mark are injuries that can be remedied by money damages.  Id.  However, defendants would also be irreparably harmed if the injunction were granted, as they would likely have to change their name in order to continue their services.  Thus, defendants would lose the goodwill behind that name that they have been building, albeit for a short amount of time.  See id. at 726; see also EMSL Analytical, Inc. v. Testamerica Analytical

Testing Corp., No. 05-5259, 2006 WL 892718, at *14 (D.N.J. Apr. 4, 2006) (holding that defendants' loss of name was irreparable harm).

An injunction would be a particularly extraordinary remedy here, moreover, given that plaintiff has not presented a compelling case of infringement.  See EMSL Analytical, Inc., 2006 WL 892718, at *14 (denying preliminary injunction, as harm to defendant was irreparable, as plaintiff did not show reasonable likelihood of success on merits of trademark infringement and unfair competition claims).

The Court therefore concludes, after balancing the harms between the parties, that granting the injunction would harm defendants more than denying the injunction would harm plaintiff. See id. (denying preliminary injunction where plaintiff did not establish reasonable likelihood of success on claims and did not present evidence of irreparable harm if injunction not granted, and where defendants would suffer irreparable harm if injunction granted).

**D.   The Public Interest**

The basic public interest implicated in nearly all Lanham Act cases is "the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy."  Id. at 730.  However, this Court has concluded that defendants' continued use of the Second Mark does not create a likelihood of confusion with respect to the First Mark.  Thus,

the only interest that would be served by granting the injnction would be plaintiff's interest in injuring a potential competitor. See EMSL Analytical, Inc., 2006 WL 892718, at *14.  Moreover, there is a public interest in free competition that would be best served by denying plaintiff's motion here.  See id.  Therefore, the public interest weighs against injunctive relief.

### CONCLUSION

The Court, for the reasons stated supra, will deny the motion.  The Court will issue an appropriate order separately.

            s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

**Dated:** March 10, 2008